ORIGINAL

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

APR 11 2017

RECEIVED

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT
FILED APR 11 2017
CLERK

| | |
|---|---|
| NICHOLAS J. BONACCI<br><br>Petitioner.<br><br>v.<br><br>TRANSPORTATION SECURITY ADMINISTRATION<br><br>Respondent. | Case No. 17-1116 |

## PETITION FOR REVIEW

Pursuant to 49 U.S. Code §46110 and 49 CFR §1503.661, Nicholas J. Bonacci (hereinafter "Petitioner") respectfully petitions this Court for review of an order, and such other procedures, and practices promulgated by the Transportation Security Administration (hereinafter "Respondent" or at other times the "TSA") as detailed herein.

Petitioner, likewise avers, within the instant proceeding, that Public Law 107-71 (November 19, 2001), which serves as the "enabling act" for the Aviation and Transportation Security Act (ASTA) (herein after the "Act"), does not authorize "passenger screening" of Petitioner, or

any other like crewmember; accordingly, this Petition for Review presents this Court with a matter of first impression.

## BACKGROUND

Petitioner has worked in the airline industry for thirty-six years, of which approximately thirty years have been as an airline pilot. Petitioner is currently employed as a pilot for a U.S. Title 14 CFR Part 121 major airline, and as such is subject to any rules, and policies promulgated by Respondent. Petitioner has completed the requisite background checks as an "individual" with access to secure areas of airports as outlined in Title 1 of the Act. Further, Petitioner has successfully completed requisite training as outlined in Title 1 of the Act, approved by the Federal Aviation Administration (FAA) and TSA, and delivered by Petitioner's airline by way of a continued qualification-training program.

Petitioner's airline is a subscriber to the Known Crewmember (KCM) program; likewise, Petitioner has an identification badge provided by Petitioner's airline to participate in the TSA approved, and operated program. KCM provides subscriber airline crewmembers access to the airport "sterile" area by verifying airline credentials, along

with another government-approved identification, so as to bypass "passenger screening." Petitioner is based in Houston, Texas, and regularly reports for assigned duties as a crewmember by utilizing the KCM.

On or about March 2, 2017, Respondent publicly announced "more invasive" searching measures that would include new "pat down" procedures. According to TSA Public Affairs Manager, Nico Mendez: "[t]his change was the result of an in-depth study completed by the TSA after a classified DHS OIG covert test in 2015." Likewise, Respondent publicly stated: "[T]he new policy also applies to airline pilots and flight attendants, classified as "known crewmembers" who generally receive less scrutiny at checkpoints." (*See Appendix Item 1: U.S. Airport Pat-Downs Are to Get More Invasive. The TSA reacts to a study that found weapons making it past security. Justin Bachman. Bloomberg LP March 3, 2017*).

## ARGUMENT

Petitioner is as an airline pilot (crewmember), and as such subject to Respondent's March 2017 order, directive, or rule concerning "enhanced pat down" searching of crewmembers." Petitioner invokes

Federal jurisdiction, and asserts lawful standing for all the threshold issues presented herein; accordingly, it would be proper, and timely, to come before this Court to be heard. (*See Sierra Club v. EPA, 292 F. 3d 895, 900-01 (DC Cir. 2003*)

Likewise, this Court enjoys exclusive subject matter jurisdiction for review of Respondent's March 2017 order, directive or rule; moreover, to examine the lawfulness of Respondent to perform "passenger screening" of Petitioner, or other like airline employees. Accordingly, Petitioner would show this Court as follows:

**The 107th Congress Did Not Contemplate Passenger Screening of Airline Employees in the Final Public Law**

Indeed, a furtive practice having escaped judicial scrutiny upwards of fifteen years, but with this latest TSA policy change, has now become ripe for judicial examination, and as such, has landed at the doorstep of this Honorable Court. Respondent has skirted the edges absent any licit authority; nonetheless, has assumed such intendance to conduct, under the color of law, "passenger screening" of crewmembers.

During the month of October 2001, the U.S. Senate proposed legislation (S. 1447) (*See Appendix Item 2: Sec. 108 Passenger and Property Screening)*, introduced by then Senator K. Hutchison of Texas,

and subsequently offered up for voice vote, after comments by Senator J. McCain of Arizona. The proposed Senate version provided for:

> "[t]he screening of airport, air carrier, foreign air carrier, and airport concessionaire employees, and other non passengers with access to secure areas, ***shall be conducted in the same manner as passenger screening***..." (Emphasis added)

Thereafter in November 2001, the final House draft was enrolled, changing both the numbering and title of the proposed law, while dropping the above-cited requirement to screen "employees" in favor of plainly worded law requiring such screening for "passengers" only. (*See Appendix Item 3: Sec. 110 Screening*)

Albeit, the "trail runs a bit cold" from the time Senators Hutchison and McCain first brought forward the proposed legislation in October 2011, until such time that the Senate again "takes up" the final version when, then Senator H. Kohl of Wisconsin states for the record the following:

> "I am pleased that all who have access to aircrafts [*sic*] will be required to pass a background check. We have reached this very important agreement and safety standards must be implemented fairly and consistently..." (*Congressional Record –Senate S11981. November 16, 2001*)

This smacks some manner of a "back room" deal, but nonetheless, demonstrates clearly Congressional intent; indeed, a requisite touchstone,

as this Court considers the application of any statutory law pertaining to an administrative agency. (*See Chevron U.S.A, Inc., v. Natural Resources Defense Council, Inc. 467 U.S. 837 (1984)*.

The *Chevron* court held:

> "[w]e should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned..."

The 107th Congress envisioned, and fostered within the Act, advanced technologies to be developed to permit access by alternate means to the sterile, secure areas of the airport, and aircraft. Such advancements were clearly intended for crewmembers, and at some later other qualified "individuals."

On October 28, 2008, the TSA reaffirmed the 107th Congress's intent in the Federal Register Part II Department of Homeland Security. Transportation Security Administration. Secure Flight Final Rule. Page No. 64062) which reads:

> *Passenger* means an individual who is travelling on a covered flight. The term *passenger* does not include:
>
> (1) A crew member who is listed as a crew member on the flight manifest; or
>
> (2) An individual with flight deck privileges under 49 CFR 1544.237 travelling on the flight deck.

Finally Title 49 CFR §1540.107, which many within the airline profession, and other industry groups believe, implicitly authorizes "passenger screening" of crewmembers by Respondent, which reads:

§1540.107 Submission to screening and inspection.

(a) No individual may enter a sterile area or board an aircraft without submitting to the screening and inspection of his or her person and accessible property in accordance with the procedures being applied to control access to that area or aircraft under this subchapter.

At first glance, this would suggest that "everyone" is obliged to submit to "passenger screening" for his or her person, and belongings; however, that does not happen in practice, nor did Respondent intend for that to "really" happen with 49 CFR §1540.107.

Suggestions of intent left aside, Petitioner would direct this Court's attention to the final version of Title 49 Part 1200 to end (Government Printing Office Version -- Revised as of October 1, 2009). Subpart B – Responsibility of Passengers and Other Individuals and Persons. As revised in 73 FR 64061 (October 28, 2008) Page 320, which reads as follow:

*Individual* means an individual whom TSA determines poses a security threat

In summary, Respondent is left wanting of any manner of authority to perform "passenger screening" on Petitioner, or other like crewmembers, with neither Title 49 CFR, nor more importantly, the Act permitting such screening measures.

**Respondent's Disregard of Law Creates Injury and Insults Petitioner's Reasonable Ability to Comply with *Sub Rosa* Rules**

Petitioner is not harmed, per se, by enhanced searching, but by the wanton disregard of plainly worded law, and Respondent's corresponding and defective agency policy(s). Hence, Petitioner is imperiled by recondite rules and procedures in force at any given time, and as such, his livelihood, and reasonable ability to comply with an awkward standard, and application of law thereby creates continued jeopardy. ((*See Fla. Audubon Soc'y v. Bensten, 94 F. 3d 658, 664 (DC Cir. 1996)* & *(Lujan v. Defenders of Wildlife 504 U.S. 555 (1992))*

This Court has previously visited the usage of Advanced Imaging Technology (AIT) and TSA misconduct by failing to provide proper notice to the public. (*See EPIC v. Dept. of Homeland Sec., 653 F. 3d 1 (DC Cir. 2011*). However with *EPIC* providing nominal background to the instant proceeding, Petitioner avers proximate harm abounds by Respondent conducting "passenger screening" absent lawful authority.

Correspondingly, Petitioner's ability (duty) to comply with rule(s), order(s), directive(s) or procedural changes, promulgated from time to time affecting his livelihood, are aggrieved. (*Infra KCM Screening George Bush Intercontinental Airport)* Consequently, Petitioner contends all such issues presented herein, are both wholly fit, and ripe for this Court's examination. *((See Occidental Permian Ltd. V. FERC, 673 F 3d 1024, 1026 (DC Cir. 2012) & (Wyo. Outdoor Council v. U.S. Forest Serv. 165 F. 3d 43, 47 (DC Cir. 1999))*

**Enhanced Pat Down Searching Intended for Passengers Who Opt Out of Advanced Imaging Technology**

When enhanced AIT, hence pat down searching, was first proposed as a primary means of passenger screening, Petitioner wrote Respondent for clarification, specifically concerning any changes for crewmembers, with the assistance of his Congressman. (*See Appendix Item 4: Letter from the TSA to Congressman K. Brady of Texas*)

At such time, Respondent carefully crafted a letter suggesting that Petitioner would not be subjected to enhanced pat down searching. More germane, though, nothing within Respondent's December 2010 letter, including cited statutory law, authorizes Respondent to conduct "passenger screening" of Petitioner, or other like crewmembers.

Subsequently, a variety of press releases and public statements by various officials from Homeland Security, including Respondent, provided more than sufficient reason to render any such concerns "moot." (*See Appendix Item 5: ALPA Scores Two Big Wins on Security Screening of Pilots. Air Line Pilot Magazine. December 2010*)

Comforting as it may have been at the time, the arbitrary and fleeting standard of rule making, policy setting or any exemption therefrom, not doubt leaves Petitioner to resort to mere "guessing" with a "here today gone tomorrow" application of agency rules and policy.

Moving forward in time, during the conduct of several hearings before the U.S. Congress, various witnesses, including various TSA administrators gave favorable testimony concerning the KCM. Some of the hearings in 2015 coincided with an internal review of TSA procedures. Even a cursory review of the various subcommittee reports suggests, that neither the KCM, nor any crewmember for that matter, posed any potential threat to aviation security. In fact, the testimony pointed to other "individuals," two of who were federal government employees that were arrested. One individual from the FAA (a firearms violation), and the other from the TSA (threatening an airport facility) --

along with other non-crewmember individuals who were committing a variety of criminal acts (including gun running) in connection with unescorted access to the secure or sterile areas. Thus making the March 2017 reasoning offered by Respondent to justify pat down searches of Petitioner as illogical at best, and worse disingenuous.

At the approximately 450 airports for which the TSA assumes responsibility for airport security as required by law, the majority of "employees" access the unescorted areas through various secured entry points most often located away from the passenger screening area. Moreover, many of these employees are "third party" employees such as cleaners, and catering personnel who have access to the "sterile area" and airplanes used in commercial passenger service.

However, because the KCM is normally located in close proximity to the passenger screening area, As such, Respondent has taken occasion to impose enhance pat down screening, clearly intended for passengers on Petitioner, and other like crewmembers only -- and not such others "employees" with unescorted access to the sterile areas, and aircraft.

More specifically, at the George Bush Intercontinental Airport, Houston Texas (where Petitioner's crew base is situated, and where

Petitioner reports for duty as a crewmember) located adjacent to the KCM, is an employee access door whereby certain "employees" with appropriate identification media, approved by the TSA, enter the sterile area. Such "employees" are subject to random inspection by the TSA; however, any such searching is done after the access door, and includes the inspection of the "employee's" accessible property, but in no way includes "invasive" or "enhanced" passenger screening. At some unknown time, crewmembers were enjoined from ever using the aforementioned access door, and compelled to access the airport complex exclusively through the KCM.

Currently at the Houston airport, when Petitioner undergoes KCM credentials verification, a randomly generated arrow is displayed on an electronic tablet for the purposes of selecting Petitioner (or any other like crewmember) for "passenger screening." Further, Petitioner, or any crewmember, selected must promptly submit to "passenger screening," under threat of discipline.

Petitioner, hereby, establishes categorically "injury-in-fact" by Respondent, singling out Petitioner for unlawful "passenger screening,"

with consequences that are disseminated by word-of-mouth, and other non-TSA sources. *(See Occidental 673 U.S. 1024 1026)*

This draconian manner of identifying crewmembers, and compelling them to undergo "passenger screening," is a wholesale abuse of discretion by Respondent. Further, any force of law asserted by Respondent to compel Petitioner to submit to illegitimate "passenger screening," or, otherwise inflict sanction, is arbitrary and capricious -- and worse yet – agency lawlessness.

**The TSA Has Become An Agency Unto Itself**

Even though, the 107th Congress specifically exempted the TSA from many of the notices, or rulemaking requirements provided for in the Administrative Procedures Act (APA); that should in no way grant the TSA, or any other agency, the powers to act in an arbitrary and capricious manner with "behind the back" rulemaking -- any such agency conduct being contrary to statutory rights and authority.

The exception in law is well intended, giving Respondent the authority to make "directives" in the public interest to promote aviation security. Clearly the 107th Congress created this exception to the APA with well-intentioned law and policy in the national security interest.

But invariably any exception to law invites unruliness, which from time to time may require appropriate correction. Such correction as it relates to Respondent, as provided for in the APA, may only come from this Court within the instant proceeding– and not the Congress.

Herein an even more profound matter of concern arises looking back to the advent of administrative, or agency, rulemaking. The framers, and early Courts, contemplated the inherent “evils” (word choice of US Supreme Court *Infra Wong Yang*) of [e]mbodying ... in one person or one agency the duties of prosecutor and judge. (*See Wong Yang Sung v. McGrath, 339 US 33*). The *Wong Yang* court warned: “[E]xperience may reveal defects...” Validating “due process” within the administrative (judicial) review province has been a continued theme in thousands of judicial opinions tracing back to *Wong Yong*.” Certainly, from the onset, both the 77th Congress and early Courts “saw it coming.”

Accordingly, Petitioner contends that both Respondent’s application, and enforcement of law, as it pertains to “passenger screening” of Petitioner is “twice dead” -- not only running afoul of legislative intent, but being inconsistent with judicial decree concerning administrative agencies since the inception of the APA.

Promulgating rules and policy (not directives) in "secret" and then disseminating such rules and policy by press releases, and word-of-mouth is a completely untenable situation, and left unchecked, imperils Petitioner, and quite frankly society as a whole. Petitioner implores this Court to weigh *in toto,* and with such gravity warranted, this latter concern, in its decision to grant review of this Petition.

As a noteworthy aside, this became an ancillary issue that was in part examined by this Court in *EPIC.* This Court held and "[r]emanded the matter back to the agency for having failed to conduct a notice-and-comment rulemaking." This Court spared vacation of the agency rule with concern that it "[w]ould severely disrupt an essential security operation..."

The March 2017 remarks of TSA Public Affairs Manager, Nico Mendez simply don't hold muster, given that the results of the DHS OIG covert test were widely publicized, and pointed to numerous failures by the TSA to effectively perform passenger screening in which an alarming number of firearms passed through the screening process undetected, along with a dismal failure to vet "passengers" enrolled in expedited access programs. The Inspector General's report is widely available for

the public to view with a minority of the report citing classified sources or findings. (*See Appendix Item 6: TSA Fails 95 Percent of Airport Security Tests Conducted by Homeland Security: Report by Andy Campbell. The Huffington Post. June 1, 2015*)

Accordingly, Respondent's announced changes have two obvious defects: firstly, there is an obvious dearth of urgency given the time to implement the new procedures; secondly, performing enhanced pat down searching of Petitioner will do nothing to remedy the manifold problems uncovered, and mostly brought on by the TSA's own internal failure. The cited report, in fact, focuses on the unchecked expansion of other expedited TSA access programs, and specifically points to a convicted felon who was granted expedited access as a passenger. (*See Appendix Tab 7: Truncated Version of Statement of John Roth. Inspector General. Department of Homeland Security Before the US House of Representatives Committee on Oversight and Government Reform. November 3, 2015. Pages 8 & 9*)

**This Court is Apt to Review and Provide Equitable Remedy**

Petitioner's newly announced invasive passenger searching procedures have the unintended consequence of "punishing the victims,"

that is, the professional pilots and flight attendants, who would otherwise be left to deal with "individuals" (threats) who may, due to Respondent's inadequacies, make their way on board an aircraft. Insulting and illogical as it may be, Respondent's March 2017 "measures" do little, or nothing, to address the finding of the report.

Nonetheless, Petitioner is most mindful of this Court's loathing to manage, or to second-guess an agency. Neither this Court, nor Petitioner, is desirous, or capable to dictate agency policy; however, the bottom-line being: the March 2017 policy, rule or directive is unlawful; accordingly, it should be most worthy of this Court's attention – and after judicial review -- vacated.

Left untouched by this Court, a dangerous precedent is left standing, for further misconduct by Respondent, and any other agency that acts beyond the scope of statutory authority or powers granted by the Congress. This Court is uniquely apt to contemplate the wisdom of an agency with seemingly unfettered authority to promulgate "secret" rules and regulations. No other segment of government enjoys limitless *extra legem* powers; however, the citizenry is, though, entitled to boundless checks and balances to bring reason and remedy when fitting.

In that vein, no other legal remedy is available to Petitioner to seek redress for his justiciable dispute; indeed, the inherent powers of this Court are absolute, proper, and unique in order to seek, and bring remedy to this worthy controversy, and to grant such relief as permitted by law.

## CONCLUSION

The rule, order, directive or procedural change(s) promulgated on or about March 2, 2017 by Respondent is arbitrary, capricious, an abuse of discretion, and otherwise, wholly not in accordance with law being in contravention to any authority granted by the Congress.

The manner of selecting and compelling Petitioner to submit to "passenger screening," and henceforth, any unlawful "invasive" or "enhanced" screening at the George Bush International Airport Houston, Texas (or any other like airport for which Respondent is responsible for security) is unlawful. As such, Respondent has used, and continues to use, illegitimate force to promulgate, and enforce rules and practices, which are indeed a clear abuse of discretion, discriminatory, arbitrary and capricious.

Petitioner prays this Court to grant review, and order the parties to submit briefs to this Court.

Petitioner prays this Court to order Respondent to provide *in camera,* or under seal, as appropriate, and if needed, any agency order(s); report(s), inter-agency correspondence or memorandum(s), internal findings, directive(s) or rule(s) for disposition of this Petition as deemed necessary by this Court.

This Court should set aside, vacate and/or reverse the rule, order, directive or procedural change of Respondent promulgated on or about March 2, 2017.

DATED this 11th day of April 2017.

Respectfully submitted,

By: ____________________
Nicholas J. Bonacci

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

# APPENDIX

### LIST OF APPENDIX ITEMS:

ITEM 1: *U.S. Airport Pat-Downs Are to Get More Invasive. The TSA reacts to a study that found weapons making it past security. Justin Bachman. Bloomberg LP March 3, 2017.*

ITEM 2: *(S 1447) Sec. 108 Passenger and Property Screening*

ITEM 3: *Final Language Enrolled Bill of the Act. Sec. 110 Screening*

ITEM 4: *Letter from the TSA to Congressman K. Brady of Texas*

ITEM 5: *ALPA Scores Two Big Wins on Security Screening of Pilots. Air Line Pilot Magazine. December 2010*

ITEM 6: *TSA Fails 95 Percent of Airport Security Tests Conducted by Homeland Security: Report by Andy Campbell. The Huffington Post. June 1, 2015*

ITEM 7: *Truncated Version. Statement of John Roth. Inspector General. Department of Homeland Security Before the US House of Representatives Committee on Oversight and Government Reform. November 3, 2015. Pages 8 & 9*

## BLOOMBERG LP

1

# U.S. Airport Pat-Downs Are About to Get More Invasive

## The TSA reacts to a study that found weapons making it past security.

by **Justin Bachman**
March 3, 2017 at 1:25:05 PM CST

While few have noticed, U.S. airport security workers long had the option of using five different types of physical pat-downs at the screening line. Now those options have been eliminated and replaced with a single universal approach. This time, you will notice.

The new physical touching—for those selected to have a pat-down—will be what the federal agency officially describes as a more "comprehensive" physical screening, according to a Transportation Security Administration spokesman.

Denver International Airport, for example, notified employees and flight crews on Thursday that the "more rigorous" searches "will be more thorough and may involve an officer making more intimate contact than before."
"I would say people who in the past would have gotten a pat-down that wasn't involved will notice that the [new] pat-down is more involved," TSA spokesman Bruce Anderson said Friday. The shift from the previous, risk-based assessment on which pat-down procedure an officer should apply was phased in over the past two weeks after tests at smaller airports, he said.
The TSA screens about 2 million people daily at U.S. airports. The agency doesn't track how many passengers are subject to pat-down searches after they pass through an imaging scanner. People who decline to use this screening technology are automatically subject to physical searches.
While passengers may find the process more intrusive, the new screening procedure isn't expected to increase overall airport security delays. However, "for the person who gets the pat down, it will slow them down," Anderson said.

The change is partly a result of the agency's study of a 2015 report that criticized aspects of TSA screening procedures. That audit, by the Department of Homeland Security's Inspector General, drew headlines because airport officers had failed to detect handguns and other weapons. An additional change prompted by the report was the TSA's decision to end its "managed inclusion" program, by which some everyday travelers were allowed to use PreCheck lanes to speed things up at peak times.

Physical screening has long been one of the traveling public's strongest dislikes regarding airport security protocols. The TSA has all pat-downs conducted by an officer of the same sex as the traveler, and allows a passenger to request a private area for the screening, as well as to have a witness present. Likewise, the traveler can request that the pat-down occur in public view.

The new policy also applies to airline pilots and flight attendants, classified as "known crewmembers" who generally receive less scrutiny at checkpoints. The TSA conducts occasional random searches of these employees, and airlines this week inquired as to whether their employees would be subject to more frequent pat-downs. The number of random searches for airline crews isn't changing and will remain a "very small percentage" of the total, Anderson said. But airport employees may face more random checks. The random searches also vary by airport, depending on the screening program, Anderson said. "Sometimes it's random, sometimes they're consistent, based on the door you enter," he said of the searches given workers with airport ID badges. "Sometimes, those measures call for a pat-down."

In their notice, Denver airport officials said employees are subject to search at random locations: "If a pat down is required as part of the operation, badged employees will be required to comply with a TSA officer's request to conduct a full body pat down."

In December, a CNN political commentator, Angela Rye, posted an article online describing her "humiliation" during a TSA agent's search. Rye wrote in graphic detail about the pat down of her genitals during a search at the Detroit Airport before a flight to New York.

TSA officials didn't immediately address whether the new universal pat-down protocol will mandate touching of passenger genitals.

# PROPOSED VERSION OF SENATE VERSION OF SEC. 108 LATER AMMENDED TO SEC. 110 IN THE FINAL BILL

S. 1447

October 11, 2001

2

**SEC. 108. PASSENGER AND PROPERTY SCREENING.**

- (a) IN GENERAL- Section 44901 of title 49, United States Code, is amended to read as follows:

**'Sec. 44901. Screening passengers, individuals with access to secure areas, and property**

'(a) IN GENERAL- The Attorney General, in consultation with the Secretary of Transportation, shall provide for the screening of all passengers and property, including United States mail, cargo, carry-on and checked baggage, and other articles, that will be carried aboard an aircraft in air transportation or intrastate air transportation. The screening shall take place before boarding and, except as provided in subsection (c), shall be carried out by a Federal government employee (as defined in section 2105 of title 5, United States Code). The Attorney General, in consultation with the Secretary, shall provide for the screening of all persons, including airport, air carrier, foreign air carrier, and airport concessionaire employees, before they are allowed into sterile or secure areas of the airport, as determined by the Attorney General. The screening of airport, air carrier, foreign air carrier, and airport concessionaire employees, and other nonpassengers with access to secure areas, shall be conducted in the same manner as passenger screenings are conducted, except that the Attorney General may authorize alternative screening procedures for personnel engaged in providing airport or aviation security at an airport. In carrying out this subsection, the Attorney General shall maximize the use of available nonintrusive and other inspection and detection technology that is approved by the Administrator of the Federal Aviation Administration for the purpose of screening passengers, baggage, mail, or cargo.

**The text below is taken from the version of the final bill the (Passed Congress/Enrolled Bill) enacted November 19, 2001**

**SEC. 110. SCREENING.**

- (a) REVIEW AND DEVELOPMENT OF WAYS TO STRENGTHEN SECURITY- Section 44932(c) of title 49, United States Code, is amended--
  - (1) by striking 'x-ray' in paragraph (4); (2) by striking 'and' at the end of paragraph (4); (3) by striking 'passengers.' in paragraph (5) and inserting 'passengers;'; and (4) by adding at the end the following: '(6) to strengthen and enhance the ability to detect or neutralize nonexplosive weapons, such as biological, chemical, or similar substances; and '(7) to evaluate such additional measures as may be appropriate to enhance inspection of passengers, baggage, and cargo.'.
- (b) PASSENGERS AND PROPERTY- Section 44901 of title 49, United States Code, is amended--
  - (1) by redesignating subsection (c) as subsection (h); and (2) by striking subsections (a) and (b) and inserting the following:

'(a) IN GENERAL- The Under Secretary of Transportation for Security shall provide for the screening of all passengers and property, including United States mail, cargo, carry-on and checked baggage, and other articles, that will be carried aboard a passenger aircraft operated by an air carrier or foreign air carrier in air transportation or intrastate air transportation. In the case of flights and flight segments originating in the United States, the screening shall take place before boarding and shall be carried out by a Federal Government employee (as defined in section 2105 of title 5, United States Code), except as otherwise provided in section 44919 or 44920 and except for identifying passengers and baggage for screening under the CAPPS and known shipper programs and conducting positive bag-match programs.

3

U.S. Department of Homeland Security
601 South 12th Street
Arlington, VA 20598

Transportation
Security
Administration

4

DEC 10 2010

The Honorable Kevin Brady
Member, U.S. House of Representatives
Attention: Ms. Janet Qureshi
200 River Pointe Drive, Suite 304
Conroe, TX 77304

Dear Congressman Brady:

Thank you for your facsimile of November 10, 2010, sent on behalf of your constituent, Mr. Nicholas J. Bonacci, concerning the Transportation Security Administration's (TSA) enhanced patdown screening procedures for flight crewmembers.

To mitigate current threats to security, TSA has approved enhanced patdown measures for all individuals who travel by air. With regard to screening procedures for flight crewmembers, including pilots and flight attendants, TSA is evaluating alternative security protocols for airline pilots that would expedite screening for this low-risk population while maintaining high security standards. TSA initiated a pilot program for one of these alternatives and the review is ongoing. TSA looks forward to continuing its collaboration with pilots on these important issues. TSA has released modified screening procedures for eligible, on-duty flight crewmembers, including exemption from screening using the Advanced Imaging Technology machines. We will continue to examine these procedures and make adjustments.

Mr. Bonacci asked which Security Directive (SD) authorizes enhanced patdown screening. SDs only apply to airlines. TSA conducts security screenings in accordance with its Standard Operating Procedures (SOPs).

Mr. Bonacci also asked by what authority these searches are conducted. Under Title 49, United States Code (U.S.C.) 44901, TSA is responsible for screening all passengers and property transported on passenger aircraft. Title 49, U.S.C. 44902, requires TSA to prescribe regulations prohibiting airlines from transporting passengers and property that have not been screened. In accordance with Title 49, Code of Federal Regulations, Part 1540.105 and 107, TSA regulations specifically provide that individuals who do not submit to TSA access and screening procedures may not enter the sterile area or board an aircraft.

Mr. Bonacci asked if he could view the SDs regarding the security measures that regulate the responsibilities of TSA. For access to the SDs, Mr. Bonacci should contact his airline. However, TSA's SOPs are Sensitive Security Information and are not available to the general public.

TSA understands that all of us would prefer not to undergo patdowns; however, we believe that these measures significantly enhance the security of air travel.

We appreciate that Mr. Bonacci took the time to share his concerns with you and hope this information is helpful. If we may be of further assistance, please call the Office of Legislative Affairs at (571) 227-2717.

Sincerely yours,

LaVita LeGrys

LaVita LeGrys
Assistant Administrator
for Legislative Affairs

5

# ALPA @ WORK

Advancing the Profession...Pilots & Staff

## ALPA Scores Two Big Wins on Security Screening of Pilots

Effective November 15, U.S. and non-U.S. airline pilots in uniform with airline identification resume security screening via walk-through metal detectors at all U.S. airport security checkpoints. They are not required to be screened with Advanced Imaging Technology (AIT) equipment (i.e., body scanners) or invasive physical patdowns.

Several confidential discussions between ALPA's president,

### ALPA's close working relationship with the DHS and the TSA yields significant improvements in airport security screening of flight crews

Capt. John Prater, DHS Secretary Janet Napolitano, and TSA Administrator John S. Pistole in early November precipitated the November 19 announcement. During these discussions, Prater voiced the concerns of U.S. and Canadian airline pilots.

The TSA recognized that non-U.S. airline pilots, including ALPA's Canadian members, should be screened in the same manner as U.S. airline pilots. Prater briefed the ALPA Canada Board on the day of the agency's announcement of this very important and welcome news.

The TSA also announced that it was working to expedite security screening by deploying ALPA-developed CrewPASS, one of the Association's Board of Directors priorities, which is "long-awaited and most welcome news," Prater said. ALPA leaders had numerous discussions in mid-November with TSA leaders, independent pilot unions, airline representatives, CrewPASS vendors, and many ALPA members about the path forward and expect to have many more such discussions during the next several months.

TSA leaders informed ALPA that the agency does not have money in its budget at this time for CrewPASS but that the TSA is working with the Congress to find a way to fund CrewPASS in the future. Staff members from ALPA's Engineering and Air Safety Department and Government Affairs Department met with legislators in late November to brief them on the status of CrewPASS implementation.

Several information technology companies have represented themselves to ALPA as being capable of offering CrewPASS services. During the past several months, the

### TSA [illegible] AIT Health And Safety Issues

[illegible] an airplane.

[illegible] radiation, especially radon gas, and cosmic radiation from space.—FP

ALPA @ WORK
Advancing the Profession...Pi[illegible] & Staff

have your airline identification with you, you are subject to being screened by AIT or an enhanced patdown like all other passengers.

### ALPA recommendations

As previously noted, ALPA has obtained relief from screening by body scanners and enhanced patdowns for flight crew members who are in uniform are have a current airline ID. However, for all other situations, we offer our members the following guidance:

- The TSA permits you to opt out of AIT screening. If you do so, however, you will be required to submit to a pat-down screening which you may find invades your privacy.
- Maintain a professional demeanor at all times, as your actions are on public display and likely are being recorded on video.
- If selected for pat-down screening, request a private search. Note: The TSA will permit a person to select and have a witness present during pat-down searches.
- If you encounter suspected unprofessional and/or inappropriate behavior by checkpoint screeners, file reports with the TSA checkpoint supervisor, your chief pilot's office, and your Master Executive Council Security Committee chairman or coordinator.
- Be aware that your ground security coordinator will not be able to help you resolve difficulties at the screening checkpoint.
- Be advised that ALPA's National Security Committee is updating and will soon publish a revised Jepp-sized brochure with more detailed information on transiting the airport screening checkpoint.

This article obviously does not address every question that may be raised about airport security screening, but ALPA's National Security Committee will continue to update ALPA members with answers to questions on this important subject as appropriate.—*Capt. Robert Powers (Alaska), ALPA National Security Committee Chairman*

## Withdrawal from Screening Process

According to the TSA, after a person "presents" himself or herself for airport checkpoint screening (i.e., submits to an administrative search), he or she cannot withdraw from the process before its completion without risk of exposure to a TSA investigation and/or local law enforcement action. The agency cites *U.S. vs. Aukai*, U.S. Court of Appeals, 9th Circuit, 2007.

The TSA does not specify the circumstances under which an individual is said to have "presented" himself or herself for screening. This depends on a particular screening checkpoint's layout and other variables.—*BP*

6

POLITICS 06/01/2015 02:07 pm ET | Updated Jun 01, 2015

# TSA Fails 95 Percent Of Airport Security Tests Conducted By Homeland Security: Report

By Andy Campbell
Crime And Weird News Editor, The Huffington Post

As thorough as the Transportation Security Administration screeners may be as they rifle through your belongings, the agency isn't performing where it counts.

In a series of trials, the Department of Homeland Security was able to smuggle fake explosives, weapons and other contraband past airport screeners in major cities across the country, according to ABC News. Officials briefed on the Homeland Security Inspector General's investigation told the station that the TSA failed 67 out of 70 tests conducted by the department's Red Teams — undercover passengers tasked with identifying weaknesses in the screening process, NJ.com reports.

During the tests, DHS agents each tried to bring a banned item past TSA screeners. They succeeded 95 percent of the time.
The internal investigation was designed to find the TSA's most egregious vulnerabilities. The TSA has said Red Team agents are "super terrorists" who "push the boundaries of our people, processes, and technology," but DHS officials told ABC the test results were frustrating at the very least.

ABC reports:
In one test an undercover agent was stopped after setting off an alarm at a magnetometer, but TSA screeners failed to detect a fake explosive device that was taped to his back during a follow-on pat down.
Officials would not divulge the exact time period of the testing other than to say it concluded recently.
Homeland Security Secretary Jeh Johnson was apparently so frustrated by the findings he sought a detailed briefing on them last week at TSA headquarters in Arlington, Virginia, according to sources. U.S. officials

insisted changes have already been made at airports to address vulnerabilities identified by the latest tests.
The TSA referred all questions to the DHS. A DHS spokesman told The Huffington Post that "Red Team testing of the aviation security network has been part of TSA's mission advancement for 13 years."

"The numbers in these reports never look good out of context, but they are a critical element in the continual evolution of our aviation security," the statement continued. "Upon learning the initial findings of the Office of Inspector General's report, Secretary Johnson immediately directed TSA to implement a series of actions, several of which are now in place, to address the issues raised in the report. These actions are in addition to a number of security enhancements the Secretary has directed TSA to implement to our aviation and airport security since the beginning of his tenure."

The administration still touts its dedication to safety and security. In a weekly report published May 29, TSA officials said they found 45 firearms and continue to discover inert grenades and other weapons "on a weekly basis." Many of the guns were found in carry-on luggage and had rounds in the chamber.

"Unfortunately these sorts of occurrences are all too frequent which is why we talk about these finds," TSA officials wrote in the report. "Sure, it's great to share the things that our officers are finding, but at the same time, each time we find a dangerous item, the line is slowed down and a passenger that likely had no ill intent ends up with a citation or in some cases is even arrested."

In 2014, the TSA confiscated 2,212 firearms at 224 airports, after screening 653 million passengers.

UPDATE: Top TSA administrator Melvin Carraway has been reassigned, Johnson announced on Monday evening. Johnson also ordered TSA to take measures to reform security by revising protocol, retraining staff, retesting airport screening equipment and conducting more random testing at checkpoints.

7

STATEMENT OF JOHN ROTH

INSPECTOR GENERAL

DEPARTMENT OF HOMELAND SECURITY

*BEFORE THE*

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

U.S. HOUSE OF REPRESENTATIVES

*CONCERNING*

# TSA: Security Gaps

November 3, 2015

## Beyond the Checkpoint

Much of the attention has been focused on the checkpoint, since that is the primary and most visible means of entry onto aircraft. But effective checkpoint operations simply are not of themselves sufficient. Aviation security must also look at other areas to determine vulnerabilities.

*Assessment of passenger risk*

We applaud TSA's efforts to use risk-based passenger screening because it allows TSA to focus on high-risk or unknown passengers instead of known, vetted passengers who pose less risk to aviation security.

However, we have had deep concerns about some of TSA's previous decisions about this risk. For example, we recently assessed the Precheck initiative, which is used at about 125 airports to identify low-risk passengers for expedited airport checkpoint screening. Starting in 2012, TSA massively increased the use of Precheck. Some of the expansion, for example allowing Precheck to other Federal Government-vetted or known flying populations, such as those in the CBP Trusted Traveler Program, made sense. In addition, TSA continues to promote participation in Precheck by passengers who apply, pay a fee, and undergo individualized security threat assessment vetting.

However, we believe that TSA's use of risk assessment rules, which granted expedited screening to broad categories of individuals unrelated to an individual assessment of risk, but rather on some questionable assumptions about relative risk based on other factors, created an unacceptable risk to aviation security.[1] Additionally, TSA used "managed inclusion" for the general public, allowing random passengers access to Precheck lanes with *no* assessment of risk. Additional layers of security TSA intended to provide, which were meant to compensate for the lack of risk assessment, were often simply not present.

We made a number of recommendations as a result of several audits and inspections. Disappointingly, when the report was issued, TSA did not concur with the majority of our 17 recommendations. At the time, I testified that I believed this represented TSA's failure to understand the gravity of the risk that they were assuming. I am pleased to report, however, that we have recently made significant progress in getting concurrence and compliance with these recommendations.

---

[1] As an example of Precheck's vulnerabilities, we reported that, through risk assessment rules, a felon who had been imprisoned for multiple convictions for violent felonies while participating in a domestic terrorist group was granted expedited screening through Precheck.

For example, I am pleased to report that TSA has stopped using one form of Managed Inclusion and has deactivated certain risk assessment rules that granted expedited screening through PreCheck lanes. However, TSA continues to use other risk assessment rules that we recommended it discontinue. We are communicating with TSA officials about these risk assessment rules; TSA recently told us it is reevaluating its position and we are awaiting formal documentation to that effect. I urge TSA to concur with our recommendations to address Precheck security vulnerabilities we identified during our review. As you may know, the House passed the *Securing Expedited Screening Act* (HR 2127), legislation that would eliminate Managed Inclusion altogether and limit risk assessment rules.

*Access to secure areas*

TSA is responsible, in conjunction with the 450 airports across the country, to ensure that the secure areas of airports, including the ability to access aircraft and checked baggage, are truly secure. In our audit work, we have had reason to question whether that has been the case. We conducted covert testing in 2012 to see if auditors could get access to secure areas by a variety of means. While the results of those tests are classified, they were similar to the other covert testing we have done, which was disappointing.

Additionally, as we discuss below, TSA's oversight of airports when it comes to employee screening needs to be improved. (*TSA Can Improve Aviation Worker Vetting (Redacted)*, OIG-15-98, June 2015)

We are doing additional audit and inspection work in this area, determining whether controls over access media badges issued by airport operators is adequate. We are also engaging in an audit of the screening process for the Transportation Worker Identification Credential program (TWIC) to see whether it is operating effectively and whether the program's continued eligibility processes ensures that only eligible TWIC card holders remain eligible.

*Other questionable investments in aviation security*

TSA uses behavior detection officers to identify passenger behaviors that may indicate stress, fear, or deception. This program, Screening Passengers by Observation Techniques (SPOT), includes more than 2,800 employees and has cost taxpayers about $878 million from FYs 2007 through 2012.

We understand the desire to have such a program. Israel is foremost in their use of non-physical screening, although the differences in size, culture, and attitudes about civil liberties make such a program difficult to adopt in this